**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Borsheim Builders Supply, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING MOTIONS** |
| | ) | **TO DISMISS** |
| vs. | ) | |
| | ) | |
| Chase Cardholder Services, Inc., a | ) | |
| Delaware Corporation, Merrick Bank | ) | |
| Corporation, a Utah Corporation, and | ) | |
| HSBC Card Services, Inc., a Delaware | ) | Case No. 1:17-cv-186 |
| Corporation | ) | |
| | ) | |
| Defendants. | ) | |

Before the court are motions to dismiss filed by Merrick Bank Corporation ("Merrick") and

HSBC Card Services, Inc. ("HSBC") (collectively the "defendants").   For the reasons set forth

below, the motions are granted.[1]

## I.   BACKGROUND

Plaintiff Borsheim Builders Supply, Inc. initiated this action by the filing of its complaint

on September 11, 2017.  In this action, plaintiff attempts to recover from defendants money that one

of plaintiff's employees, Daphney Harstad ("Harstad"), fraudulently diverted and used to pay off

personal debts she owed on credit cards issued by defendants.   In relevant part, the complaint

alleges:

> 1.    Plaintiff, Borsheim Builders Supply, Inc., is a North Dakota Corporation,
> with its principal place of business located in Williston, North Dakota.

> 2.    Upon information and belief, Defendant, Chase Cardholder Services, Inc.

---

[1]  Plaintiff also named Chase Cardholder Services, Inc. as a defendant.  However, Chase Cardholder Services has never appeared and plaintiff has not filed a proof of service indicating it was served with the summons that was issued. For this reason, Chase Cardholder Services has been eliminated from the caption.

1

(hereinafter "Chase"), is a corporation organized in the state of Delaware, with its principal place of business located in Wilmington, Delaware.

3.      Upon information and belief, Defendant, Merrick Bank Corporation (hereinafter "Merrick"), is a corporation organized in the state of Utah, with its principal place of business located in Jordan, Utah.

4.      Upon information and belief, Defendant, HSBC Card Services, Inc. (hereinafter "HSBC"), is a corporation organized in the state of Delaware, with its principal place of business located in Wilmington, Delaware.

BACKGROUND

5.      Plaintiff Borsheim is a large crane company operating in North Dakota.

6.      Borsheim employed an office manager, Georgene Baustad, who was going to retire and planned to train a successor. Ms. Baustad hired Daphney Harstad (hereinafter "Harstad") in 1997, and she was trained to replace Ms. Baustad over the course of two years.

7.      Between 1997 and 2010, Borsheim grew substantially and maintained over 70 employees by 2010. Due to the length of time Ms. Harstad was employed with the company and the growing demands of her position, she was granted authority to sign checks on behalf of the company like many accountants are.

8.      On or around March of 2014, Borsheim discovered, through various discrepancies and questionable practices, that Harstad had been embezzling and otherwise misappropriating Borsheim funds for personal use, including paying her personal credit cards bills using Borsheim checks, and referring to her personal accounts on the subject line of said checks.

9.      This specific practice of using checks to pay Harstad's credit card debts was done for several years and were sent to each of the Defendants systematically over long periods of time.

10.     Defendants, each of them, accepted these checks and wired said funds into their accounts so as to satisfy the personal debts of Ms. Harstad that she had accrued through the use of her credit cards and/or other financial services.

11.     Upon information and belief, not one of the Defendants ever questioned or investigated the payment method or that the checks were coming from Borsheim Crane rather than Harstad herself.

12.     The practice of sending the checks as payment to the various Defendants continued for years with no inquiry or investigation into her practices and failed to implement any safeguards that would prevent such fraud.

13.     In or around July of 2014, the embezzlement and other fraudulent activities were investigated by authorities, including the FBI, and Ms. Harstad was subsequently

prosecuted on federal charges.

14.     Since the embezzlement and fraudulent payments were discovered, no payments have been returned by any of the named Defendants.

15.     The exact amount each Defendant has received, including date, is as follows:

Chase Card Services - $1,422,889.71

Card Services - $35,089.96

Merrick Bank - $343,604.11

HSBC - $111,766.82

(Doc. No. 1) (emphasis in bold eliminated).   In seeking to recover the embezzled money, plaintiff

asserts claims for conversion, negligence, aiding and abetting fraud, and money had and received.

In the motions to dismiss now before the court, defendants argue that plaintiff's claims  must

be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure state a claim upon which relief can be

granted.  More particularly, defendants argue that the claims are not legally cognizable for various

reasons.  They also argue the claims are time-barred.  Finally, defendants contend that the aiding and

abetting fraud claim must be dismissed because of the failure to plead it with the particularity

required by Fed. R. Civ. P. 9(b).

## II.     DISCUSSION

### A.     Whether plaintiff has sufficiently pled its fraud claim

#### 1.     Introduction

Defendants argue that plaintiff has failed to plead its claim of aiding and abetting Harstad's

fraudulent conduct with the particularity required by Fed. R. Civ. 9.  According to the defendants:

> [a]bsent from the claim are any particular references to (1) the bank employees or representatives who had knowledge of and provided substantial assistance to Harstad in carrying out her fraudulent scheme; (2) the specific checks used to perpetuate the fraudulent scheme; (3) when the alleged fraudulent scheme was agreed upon; (4) how the fraudulent scheme was carried out. Simply put, the claim fails to identify specifically the "who, what,

where, when, and how" of the alleged fraud and should be dismissed.

(Doc. No. 8, p. 13). Defendants argue that because of these deficiencies plaintiff's fraud claim should be dismissed.

## 2. Governing law

Fed. R. Civ. P. 12(b)(6) requires dismissal of an action if there has been a failure to state a claim upon which relief can be granted. To state a cognizable claim, the complaint need only meet the requirement of Rule 8(a)(2) that it contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Erickson v. Pardus, 551 U.S. 89, 93 (2007). The exceptions are those claims covered by Rule 9(b), which will be addressed separately below.

While the pleading requirements of Rule 8(a)(2) are not onerous, more is required than simply expressing a desire for relief and declaring an entitlement to it. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 n.3 (2007) ("Twombly"). The complaint must state enough to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Id. at 555. Also, the complaint must state enough to satisfy the "plausibility standard" for stating a cognizable claim as established in Twombly and further amplified by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 678–84 (2009) ("Iqbal").

Under the Iqbal/Twombly plausibility standard, the complaint must state enough factual matter, which if accepted as true, states a claim that is plausible on the face of the allegations. See id. A claim crosses the threshold of being plausible when the factual allegations do more than merely create a suspicion of a legally cognizable action and "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. Complaints that offer nothing more than labels and conclusions or a formulaic recitation of the elements are not sufficient. Twombly, 550 U.S. at 555;

4

Iqbal, 556 U.S. at 680–81.

Determining whether a complaint states a plausible claim is "a context specific task" that requires the court "to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

Fraud claims must comply with the heightened pleading standards of Rule 9(b), which require plaintiffs to plead "the circumstances constituting fraud . . . with particularity." Fed. R. Civ. P. 9(b). "Under Rule 9(b), a plaintiff must plead 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001). "Therefore, the party must typically identify the 'who, what, where, when, and how' of the alleged fraud." United States ex rel. Costner v. URS Consultants, Inc., 317 F.3d 883, 888 (8th Cir. 2003). "This requirement is designed to enable defendants to respond 'specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct.'" Abels, at 920. "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007) (quoting Commercial Prop. Invs. v. Quality Inns Int'l Inc., 61 F.3d 639, 644 (8th Cir. 1995)).

That being said, "[a] Plaintiff need not show each factor to plead fraud with sufficient particularity. Instead, a Plaintiff must state enough so that the pleadings are not merely conclusory." Cunningham v. PFL Life Ins. Co., 42 F. Supp. 2d 872, 885 (N.D. Iowa 1999) (quoting Roberts v. Francis, 128 F.3d 647, 651 n.5 (8th Cir. 1997)). "The level of particularity required depends on,

inter alia, the nature of the case and the relationship between the parties." <u>Payne v. U.S.</u>, 247 F.2d 481, 486 (8th Cir. 1957).  Further, under Rule 9(b) only the circumstances of the fraud must be pled with particularity. The Rule provides that:  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

### 3.      Plaintiff has satisfied its pleading requirements

Here, plaintiff has pled more than labels and conclusions.  Plaintiff outlined in detail Harstad's fraudulent conduct.  And, with respect to the defendants, plaintiff alleged that the checks they took were in plaintiff's name as the drawer and not Harstad's, that the checks were presented to the defendants for satisfaction of Harstad's personal credit card debts, and that defendants applied the proceeds from the checks for that purpose.  Finally, plaintiffs pled the total amounts of the checks involved for each of the defendants (the total amounts were sizeable) and the time period during which the fraud allegedly took place.  This is sufficient to meet the requirement of Rule 9(b) that the "circumstances" of the fraud be pled with particularity.[2]

As for defendants' purported knowledge, Rule 9(b) permits that it can be pled generally. And, in this case, plaintiff went beyond that by pleading facts, which if true, *may* be circumstantial evidence that defendants had the requisite knowledge of Harstad's defalcations.

Finally, if defendants' argument is that plaintiff has not pled enough to make out a claim for aiding and abetting fraud that satisfies the "plausibility" requirement of  <u>Iqbal</u>/<u>Twombly</u>, that too is rejected.  While there are a number of reasons why defendants may not have been aware of the underlying fraud, it is not out of the realm of possibility that defendants may have had actual

---

[2] As noted earlier, defendants argue that plaintiff's complaint is deficient because, among other things, it failed to identify the bank employee that provided substantial assistance to Harstad and when the scheme to defraud was agreed upon. But here, plaintiff has not alleged that defendants conspired with Harstad, only that they aided and abetted the fraud.

knowledge of the fraud. For example, defendants may have detected the fraud as apart of a fraud detection program, but decided to take the checks anyway in order to avoid losses resulting from their having already paid the merchants or other persons that Harstad presented her credit cards to. While this appears to be on the lower end of probability, and while the court is skeptical that plaintiff will be able to prove defendants possessed the requisite knowledge for plaintiff to prevail on a claim of aiding and abetting fraud, this skepticism alone does not mean plaintiff has failed to satisfy the "plausibility" requirement of Iqbal/Twombly. See Apex IT v. Chase Manhattan Bank USA, N.A., Civ. No. 04-2684, 2005 WL 612915 (D. Minn. Mar. 11, 2005) (denying defendant's motion to dismiss even though the court expressed doubt "that a financial institution the size of Chase could have been aware of the 'unusual' nature of the payments at issue").

**B.    Statute of limitations**

**1.    Introduction**

In 1991, North Dakota adopted in substantial part the 1990 revisions to Articles 3 and 4 of the Uniform Commercial Code ("UCC"). This included, for the first time, a statute of limitations codified at § 41-03-18 (3-118). See 2 White, Summers, & Hillman, Uniform Commercial Code § 17:46 (6th ed. Nov. 2018 update) ("White, Summers, & Hillman"). While the limitations period relevant here is the three-year limitations period in subsection (7), the entire statute is set forth below for purposes of context:

§ 41-03-18. (3-118) Statute of limitations

1. Except as provided in subsection 5, an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note or, if a due date is accelerated, within six years after the accelerated due date.

2. Except as provided in subsection 4 or 5, if demand for payment is made to the

maker of a note payable on demand, an action to enforce the obligation of a party to pay the note must be commenced within six years after the demand. If no demand for payment is made to the maker, an action to enforce the note is barred if neither principal nor interest on the note has been paid for a continuous period of ten years.

3. Except as provided in subsection 4, an action to enforce the obligation of a party to an unaccepted draft to pay the draft must be commenced within three years after dishonor of the draft or ten years after the date of the draft, whichever period expires first.

4. An action to enforce the obligation of the acceptor of a certified check or the issuer of a teller's check, cashier's check, or traveler's check must be commenced within three years after demand for payment is made to the acceptor or issuer, as the case may be.

5. An action to enforce the obligation of a party to a certificate of deposit to pay the instrument must be commenced within six years after demand for payment is made to the maker, but if the instrument states a due date and the maker is not required to pay before that date, the six-year period begins when a demand for payment is in effect and the due date has passed.

6. This subsection applies to an action to enforce the obligation of a party to pay an accepted draft, other than a certified check. If the obligation of the acceptor is payable at a definite time, the action must be commenced within six years after the due date or dates stated in the draft or acceptance. If the obligation of the acceptor is payable on demand, the action must be commenced within six years after the date of the acceptance.

7. Unless governed by other law regarding claims for indemnity or contribution, an action for conversion of an instrument, for money had and received, or like action based on conversion, for breach of warranty, or to enforce an obligation, duty, or right arising under this chapter and not governed by this section must be commenced within three years after the cause of action accrues.

What is notable about § 41-03-18 (3-118) is that the longer periods of limitation apply to contractual liability on the obligations that are the subject of certain instruments, and the shorter three-year limitation periods apply for the most part to claims arising out of the acceptance, negotiation, and processing of negotiable instruments. The obvious reason for the shorter three-year period of limitations is the desire to provide greater certainty and finality when dealing with instruments that are negotiable. This is further reflected in Article 4 of the UCC which governs bank

deposits and collections and includes provisions that govern the liability of banks in the handling and collection of negotiable instruments. Article 4 has a corresponding three-year statute of limitations for claims arising under that chapter. N.D.C.C. § 41-04-11 (4-11).

For reasons that will be discussed later, if the three-year limitations period in subsection (7) of § 41-03-18 (3-118) applies to one or more of plaintiff's claims, then the complaint must be dismissed all or in part.

> **2. Defendants' argument that the 1990 revisions to UCC Article 3 have displaced all common law remedies so there is no possibility of any longer statute of limitations applying**

One of defendants' arguments is that the 1990 revisions to UCC Article have completely displaced the common law remedies being asserted in this case for conversion, money had and received, negligence, and fraud. Hence, according to defendants, the only claims that plaintiff might have arise under the UCC and are governed by the three-year limitations period of § 41-03-18(7) (3-118).

Plaintiff disagrees. Plaintiff argues that all of the claims it has pled are standalone common law claims that have not been displaced by the UCC, and that the six-year statute of limitations set forth in N.D.C.C. § 28-01-16 applies to each of the claims.[3] In support of its argument that all of its claims are freestanding common law claims that have not been displaced by the UCC, plaintiff relies in substantial part on N.D.C.C. § 41-01-03 (1-103), which reads:

> § 41-01-03. (1-103) Construction of title to promote the title's purposes and policies--Applicability of supplemental principles of law
>
> 1. This title must be liberally construed and applied to promote the title's underlying purposes and policies, which are:

---

[3] Section 28-01-16 provides a catch-all six-year limitations period for claims for injury to persons or rights of another that do not arise out of contract and have not otherwise been specifically provided for.

a. To simplify, clarify, and modernize the law governing commercial transactions;

b. To permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; and

c. To make uniform the law among the various jurisdictions.

2. Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement this title.

If defendants' argument is that Article 3 has displaced all liability except that which Article 3 expressly provides for, the court does not believe the North Dakota Supreme Court would agree. Section 41-01-03(2) (1-103) specifically provides that principles of law and equity can supplement the provisions of the UCC codified in Title 41. Further, Article 3 provides for few express causes of action and mainly addresses the scope of and limitations upon liability, standards of care, and defenses. Finally, in cases discussed in the next section, the North Dakota Supreme Court has exhibited a willingness to look to common law principles to give rise to liability beyond what is expressly provided for in Article 3. Consequently, while the number of instances in which common law principles may be looked to as creating liability beyond what is expressly provided for under Article 3 may be fewer with the 1990 revisions, the North Dakota Supreme Court likely would not conclude that the only liability of parties with respect to negotiable instruments is that expressly provided for in Article 3. See, e.g., In re Pratt, 2017 WL 4516822, at *5 (rejecting argument that a claim for unjust enrichment in a similar case against a credit card company was displaced by Article 3 due to the comprehensiveness of its provisions).

But, the application of common law principles to create liability beyond what might be expressly provided for in Article 3 does not mean the resulting claim would be completely freestanding and devoid of application of Article 3's provisions that may shape its scope or provide,

applicable defenses.  As discussed next, the North Dakota Supreme Court would likely conclude that Article 3's three-year limitations period would apply to all of plaintiff's claims even if common law principles are relied on to supplement Article 3's provision and create liability beyond what Article 3 may expressly provide for.

### 3. The North Dakota Supreme Court would likely conclude that Article 3's three-year limitations period applies to plaintiff's claims

#### a. The cases relied upon by plaintiff for its argument that it has freestanding common law claims to which a longer statute of limitations applies

In addition to relying upon N.D.C.C. § 41-01-03 (1-103), which  permits applying common law principles when appropriate to supplement the provisions of the UCC, plaintiff cites to several cases in support of its argument that its claims arise under common law and that the longer, six-year statue of limitations applies.

#### i. *Great American Ins. Companies v. American State Bank of Dickinson*

One of the cases that plaintiff relies upon is Great American Ins. Companies v. American State Bank of Dickinson, 385 N.W.2d 460, 462 (N.D. 1986) ("Great American").  At issue in Great American was a bank's acceptance of a check issued by an insurer that was endorsed by only one of two named payees.  The insurer obtained an assignment of rights from the non-endorsing co-payee and sued the bank for conversion.  The state district court entered judgment against the bank following a bench trial.  The bank appealed, asserting, *inter alia*, that the state statute codifying a former version of UCC § 3–419 had displaced the common law for conversion in North Dakota and that its acceptance of the check without the endorsement of the co-payee did not constitute conversion under the UCC.  The North Dakota Supreme Court disagreed, stating:

[The insurer] counters that a collecting bank that pays a draft without the endorsement of a joint payee is liable to that joint payee for conversion under common law and also under the U.C.C. because the general principles of common law supplement the U.C.C. Section 41–01–03 [U.C.C. § 1–103], N.D.C.C. We agree.

We are not persuaded by [the bank's] argument because the particular language of Section 41–01–03 [U.C.C. § 1–103], N.D.C.C., permitting common law supplementation of the U.C.C., controls the general language of Section 1–01–06, N.D.C.C. See Section 1–01–07, N.D.C.C. We do not believe that the common law of conversion has been displaced by the particular provisions of the U.C.C. See Willow City v. Vogel, Vogel, Brantner & Kelly, 268 N.W.2d 762 (N.D.1978).

Although Section 41–03–56(1) [U.C.C. § 3–419(1)], N.D.C.C., does not specifically provide that payment without the endorsement of a payee constitutes conversion, we agree with those jurisdictions which have supplemented the U.C.C. with common law and determined that, for purposes of conversion of a negotiable instrument, there is "no legal difference between payment of an instrument on a forged endorsement and payment on no endorsement by the payee at all." E.g., Humberto Decorators, Inc. v. Plaza National Bank, 180 N.J.Super. 170, 174, 434 A.2d 618, 619 (1981). See generally Annot., 47 A.L.R.3d 537, 540 (1973); 6 Anderson, Uniform Commercial Code § 3–419:18 (3rd Ed.).

Conversion is the wrongful exercise of dominion over the property of another in a manner inconsistent with, or in defiance of, the owner's right. Dairy Dept. v. Harvey Cheese, Inc., 278 N.W.2d 137 (N.D.1979). We believe that payment of an instrument on a forged endorsement and payment on no endorsement by the payee both constitute the wrongful exercise of dominion over the property of another in a manner inconsistent with the owner's rights. In our view, the absence of an endorsement presents a more compelling case for conversion than a forged endorsement because a missing endorsement is easily discernible, while a forged endorsement is the result of an error in the identification of a payee. See United States Fidelity & Guaranty Co. v. Peoples National Bank of Kewanee, 24 Ill.App.2d 275, 164 N.E.2d 497 (Ill. App. Ct.1960). Accordingly, we hold that a bank that pays a draft without obtaining the endorsement of a co-payee may be liable to that co-payee for conversion of the draft.

Id. at 462.

While the North Dakota Supreme Court in Great American did look to common law principles of conversion to supplement those of the UCC to create liability, the court did not address whether the claim was a standalone claim for conversion or whether it was a claim arising under the UCC, albeit one supplemented by common law principles, such that it might be subject to other Article 3 provisions. Further, there was no issue with respect to statute of limitations in Great American nor could there have been since this case predated the 1990 revisions to Article 3 that

added a statute of limitations. Finally, given what the court stated about looking to common law to supplement the existing provisions of Article 3 so that the missing endorsement scenario (which was not covered by the UCC at the time) would not be treated differently from a forged endorsement (which was covered by Article 3) the court likely would not have applied different statute of limitations to the two claims had the shorter and more specific three-year limitations period been in effect. Rather, the court likely would have concluded that, even though common law was looked to supplement the UCC's provisions and create liability, the claim would still be one arising under Article 3 and subject to any other provisions that might be applicable.

### ii. *Alerus Financial, N.A. v. Western State Bank*

Another case relied upon by plaintiff for standalone common law claims is Alerus Financial, N.A. v. Western State Bank, 2008, ND 104, ¶¶ 46–51, 750 N.W.2d 412. In Alerus, the claims relevant to this case involved the attempt on the part of a trust to recover money it had lost as result of embezzlement on the part of one its trustees. In that case, the trustee committing the defalcations wrote checks drawn on the trust's account at Alerus Financial, made the checks payable to defendant Western State Bank, and then tendered the checks to Western State Bank in satisfaction of personal debts owed by the trustee to that bank. The trustee had the authority to sign trust checks generally, but arguably not the authority to write checks on the trust's account to satisfy his personal debts to Western State Bank. When the trustee's defalcations were uncovered, the other trustees sued Western State Bank as well as another defendant on claims not relevant here. Id. at ¶¶ 2–13

The principal claims of the trust against Western State Bank were for conversion, negligence, and breach of a fiduciary duty, which the Trust contended were claims arising both under common law and the UCC. The trial court had dismissed the conversion claim based upon its conclusion that

the trustee had the authority to issue the checks and Western State Bank could rely upon that. As for the negligence and breach of fiduciary claims, the trial court concluded Western State Bank owed no duty to the trust since it did not have banking relationship with it. Id. at ¶¶ 13, 35–51.

The North Dakota Supreme Court on appeal held that the trial court had erred in dismissing all of these claims based upon the reasons it had articulated. With respect to the conversion claim, the court concluded there were material issues of disputed fact with respect to whether the trustee had actual authority to sign the checks in question (it appeared he did not) and whether Western State Bank had actual notice of the lack of authority. And, in discussing why these questions were relevant, the court referenced N.D.C.C. § 41-01-09(2)(oo) (1-201) defining unauthorized signatures and § 41-03-40(s) (3-403) stating that, if more than one person's signature is required to constitute an authorized signature of an organization, the signature is unauthorized if one of the required signatures is missing. Id. at ¶¶ 37–45. With respect to the negligence and breach of fiduciary claims, the court concluded that Alerus's duty was defined by § 41-03-33 (3-307) and there were material issues of disputed fact with respect to whether that duty was breached given the existence of circumstances that may have put Alerus on notice of the breach of fiduciary duty by the person signing the checks. Id. at ¶¶ 46–50. The court then remanded the case to the district court to reconsider the conversion, negligence, and breach of fiduciary claims, but without deciding at the end of the day whether the trust actually had good claims. The court stated that it wanted the trial court in the first instance to address whether Western State Bank had defenses under the UCC or by application of common law principles. Id. at ¶ 51.

Alerus leaves as many questions unanswered as it decided. For example, did the Trust actually have a viable conversion claim? Notably, the court did not address the consequences, if

14

any, of § 41-03-57 (3-420), which specifically addresses claims for conversion. Also, it did not address the common law doctrine that there is no action for conversion of cash unless it can be traced to specific account where it may remain. This doctrine is addressed in more detail later. With respect to the breach of fiduciary claim, the court appears to suggest that it arises out of § 41-03-33 (3-307), but, if so, it would have to be an implied cause of action since that section itself does not appear to specifically create liability. See White, Summers, & Hillman § 19.34. Also, how does such a claim differ, if at all, from the negligence claim that the court suggested might also be available with § 41-03-33 (3-307) defining the applicable duty? Finally, the court explicitly left open the question of defenses, which might include whether the trust would be foreclosed from collecting because of its own conduct in apparently not inspecting its statements and detecting the fraud or have its fault compared with the defendants. Some of these points will be returned to later.

However, relevant to the point under discussion now, there is nothing in Alerus which suggests that the North Dakota Supreme Court would conclude that the claims it left open for further development by the trial court would be freestanding common law claims that would not be subject to Article 3 provisions that may limit the scope of the claims and provide defenses. In fact, the contrary appears to be true given that the court referenced provisions of Article 3 to frame or otherwise give content to the potential claims for conversion, negligence, and breach of a fiduciary duty.

### iii.    *Mott Grain Co. v. First National Bank & Trust of Bismarck*

Another case referenced by plaintiff is the North Dakota Supreme Court's decision in Mott Grain Co. v. First National Bank & Trust of Bismarck, 259 N.W.2d 667 (N.D. 1977). In that case,

the manager of a grain elevator, who was also one of its three co-owners, endorsed checks made out to the elevator for deposit into his personal account at the defendant bank with whom the elevator also had a banking relationship.  Id. at 668.  On appeal, the North Dakota Supreme Court affirmed the judgment of the trial court that the defendant was liable in negligence for failing to ascertain that the manager's dealing with the checks as his own was beyond his authority.  Like the preceding cases, this case is of no help to the plaintiff with respect to the point under consideration now.  While the North Dakota Supreme Court upheld the claim of negligence, it did so after applying Article 3's provisions with respect to what duty was owed by the defendant bank (which unlike the defendants in this case had a banking relationship with the grain elevator) and only after concluding that the Article 3's defense of holder in due course was not available.  Id. at 669–71.  In fact, the court explicitly stated:  "This case is governed by the Uniform Commercial Code, Chapter 41-01 and Chapter 41-03, N.D.C.C." Id. at 669.

### iv.    *Cassello v. Allegiant State Bank*

Finally, plaintiff relies upon the Eighth Circuit's decision in Cassello v. Allegiant State Bank, 288 F.3d 339, 341 (8th Cir. 2002).  In that case, the Eighth Circuit summarized what was at issue and the  holding of the district court as follows:

> According to the complaint, Ronald Roberts and Kenneth Powell fraudulently induced the plaintiffs to write checks or to transfer funds by cashier's check to them, or to organizations controlled by them, in amounts that totaled more than $2.5 million. The plaintiffs further alleged that the defendants, Allegiant and Royal, acted negligently in depositing these checks because the checks lacked proper endorsements or were made payable to entities other than the ones into whose accounts they were deposited. The district court concluded that the Uniform Commercial Code (UCC) preempted any common-law claims for negligence against depositary banks, and that the UCC itself provided no cause of action for the maker of a check or the purchaser of a cashier's check against a depositary bank that improperly deposits the check.

Id. at 340.  The Eighth Circuit reversed and remanded the case for further consideration, stating:

The UCC provides that "principles of law and equity ... shall supplement its provisions" unless "displaced by [its] particular provisions." Mo.Rev.Stat. § 400.1–103. We have discovered no "particular provision" of the UCC that would "displace" a common-law claim of negligence, so we conclude that the Missouri Supreme Court would hold that a drawer of a check could have a common-law cause of action against a depositary bank for negligently handling the drawer's check.

We come to this conclusion with some very considerable reluctance because of the holding in City of Wellston. But it is important to our reasoning that the UCC itself quite specifically reserves common-law claims unless they are particularly displaced by one of its provisions. The code, in other words, does not purport to occupy the field so completely as to preempt altogether any other law dealing with bank collections. In short, it is not the only place to look to determine whether an action lies in the present circumstances.

One other point bears mentioning. We have not reached the question of whether the facts pleaded by the plaintiffs in this case actually make out a claim of negligence, because the parties have not raised or briefed that issue. We leave that matter to such further proceedings in the district court as may occur.

Id. at 341.

There are two reasons why Cassello is of no help to plaintiff here. First, in Cassello, the Eighth Circuit applied what it believed to be Missouri law, albeit reluctantly, because it relied upon a Missouri Supreme Court case that was not directly on point. Here, the court must predict how the North Dakota Supreme Court would decide the issues now before the court. Second, while the Eighth Circuit framed the issue as to whether the potential claim may be a claim arising under common law and not displaced by the UCC, the court did not reach the issue of whether the common law claim would be a completely standalone claim or whether it might be subject to defenses that might be available under Missouri's version of Article 3. In fact, the court specifically stated it was not even deciding whether there was a claim for negligence based on the facts pled because the parties had not briefed it.

b. **The North Dakota Supreme Court likely would conclude that Article 3's three-year limitations period would apply to all claims in which a negotiable instrument plays a central part even when common law principles are applied to create liability**

As already discussed, the North Dakota Supreme Court is unlikely to conclude that the only liability in a case involving a negotiable instrument is that which Article 3 expressly provides for. That being said, the North Dakota Supreme Court is likely to conclude that, when a negotiable instrument is central to a claim against a defendant, the claim arises out of Article 3 and is subject to Article 3's three-year period of limitations even when common law principles are used to create liability that is in addition to what Article 3 expressly provides. Or, to put it somewhat differently, Article 3's three-year limitations period has displaced statutes that otherwise might apply to claims applying the common law principles used to supplement Article 3's provisions. This essentially was the conclusion reached by the New Mexico Court of Appeals in Gallagher v. Santa Fe Federal Employees Federal Credit Union, 52 P.3d 412, 418 (N.M. 2002) ("We do not decide today whether common law claims aside from conversion are displaced by the UCC. We do, however, interpret Section 55-3-118(g) as intending to displace statutes of limitations outside of the UCC that may apply to these common law claims.").

The court believes that the North Dakota Supreme Court would reach the conclusion that Article 3's three-year limitations period applies to all cases in which a negotiable instrument is central to the claim, even if common law principles are relied upon to create liability, for the following reasons:

- Even when common law principles are applied to create liability beyond what Article 3 expressly provides for in a case involving a negotiable instrument, the official comments by the drafters to UCC 1-103 support a construction that the claim is still one arising out Article 3. In relevant part, the official comments provide:

> 2. **Applicability of supplemental principles of law**. Subsection (b) states the basic relationship of the Uniform Commercial Code to supplemental bodies of law. The Uniform Commercial Code was drafted against the backdrop of existing bodies of law, including the common law and equity, and relies on those bodies of law to supplement its provisions in many important ways. At the same time, the Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to supplant its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise. In the absence of such a provision, the Uniform Commercial Code preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.

> The language of subsection (b) is intended to reflect both the concept of supplementation and the concept of preemption. Some courts, however, had difficulty in applying the identical language of former Section 1-103 to determine when other law appropriately may be applied to supplement the Uniform Commercial Code, and when that law has been displaced by the Code. Some decisions applied other law in situations in which that application, while not inconsistent with the text of any particular provision of the Uniform Commercial Code, clearly was inconsistent with the underlying purposes and policies reflected in the relevant provisions of the Code. See, e.g., Sheerbonnet, Ltd. v. American Express Bank, Ltd., 951 F. Supp. 403 (S.D.N.Y. 1995). In part, this difficulty arose from Comment 1 to former Section 1-103, which stated that "this section indicates the continued applicability to commercial contracts of all supplemental bodies of law except insofar as they are explicitly displaced by this Act." The "explicitly displaced" language of that Comment did not accurately reflect the proper scope of Uniform Commercial Code preemption, which extends to displacement of other law that is inconsistent with the purposes and policies of the Uniform Commercial Code, as well as with its text.

Official Comments to UCC § 1-103 (italics in original).

- The breadth of the text of § 41-03-18(7) (3-118), which, for purposes of

convenience, is set forth again as follows:

> 7. Unless governed by other law regarding claims for indemnity or contribution, an action for conversion of an instrument, for money had and received, or like action based on conversion, for breach of warranty, or to enforce an obligation, duty, or right arising under this chapter and not governed by this section must be commenced within three years after the cause of action accrues.

Notably, while Article 3 contains a specific provision that applies to conversion of instruments at § 41-03-57 (3-420), subsection (7) suggests that it applies to the application of common law conversion principles beyond what Article 3 expressly provides for in its use of the language: "an action for conversion of an instrument, for money had and received, or like action based on conversion . . . ." Further, while subsection (7) does not explicitly reference negligence or fraud, these arguably are covered by the language "or to enforce an obligation, duty, or right arising under this chapter . . . [,]" reading "arising under this chapter" broadly to include any claim in which a negotiable instrument plays a substantial part.

- Construing the sweeping language of § 41-03-18(7) (3-118) to apply to all claims in which a negotiable instrument plays a substantial part, even when supplemented by common law principles, is consistent with Official Comments to UCC § 1-103 already discussed as well as the policies and goals of Articles 3 and 4, which set forth an intricate scheme of rights and duties of those involved in the use, handling, and processing of negotiable instruments as well as allocating losses resulting from transactions that have gone awry. More particularly, a shorter and more uniform statute of limitations advances the goals of Articles 3 and 4 of providing greater certainty and finality with respect to the commercial transactions involving

negotiable instruments.  See, e.g.,  PSI Resources, LLC v. MB Financial Bank, Nat. Ass'n, 55 N.E.2d 186, 196 (Ill. App. 1st Dist. 2016) (application of the shorter three limitations period in Article 4 furthers the purposes of the UCC of promoting commercial finality and certainty); Bradley v. First Nat. Bank of Walker, N.A., 711 N.W.2d 121, 125–28 (Minn. Ct. App. 2006).  Also, the shorter statute of limitations is consistent with the general notion reflected in other sections of Articles 3 and 4 that persons employing, taking, or otherwise dealing with instruments that are *negotiable* need to be vigilant in protecting their rights.

- As already discussed, the cases in which the North Dakota Supreme Court has considered common law principles in adjudicating claims involving negotiable instruments, it has not resolved or suggested it would resolve the cases based upon common law principles independent of the provisions of Article 3.  Rather, it has looked to Article 3's provisions when they limit the rights and obligations of the parties and otherwise provide defenses.

In concluding that the North Dakota Supreme Court would hold that the UCC's three-year limitations period would apply to claims in which a negotiable instrument plays a central role even if common law principles are looked to provide liability in supplementation of Article 3's provisions, the undersigned acknowledges it might be a closer question with respect to plaintiff's claim of aiding and abetting fraud.  With respect to that claim, plaintiff alleges that defendants aided and abetted Harstad's fraud, contending that they knew or should have known of her fraudulent conduct when they took the checks at issue, submitted them for collection to plaintiff's bank, and then used the proceeds to reduce her credit card debt.

As an initial matter, the court does not believe plaintiff has a separate claim for fraud based

on the "should have known" contention.   Rather, any claim that defendants "should have known" would be for negligence or some other non-fraud claim.   Hence, the court confines its consideration here to plaintiff's allegations that defendants had actual knowledge that Harstad lacked the authority to write the checks they took and that the checks were taken for an improper purpose.   Even in this instance, the court believes the North Dakota Supreme Court would conclude that the three-year limitations period would apply.

First, even though § 41-03-18(7) (3-118) does not specifically reference fraud, the most commonsense reading of the section (particularly in context of Article 3's other provisions which deal with instances of fraud, *e.g.*, fraudulent endorsements) is that it has displaced all other statutes of limitations for claims in which negotiable instruments plays a central part.   Second, proving actual knowledge of an underlying fraud is often difficult and, in some instances, jurors may be allowed to find the existence of the requisite knowledge based upon circumstantial evidence.   And, in that instance, the provisions of Article 3 may very well impact what circumstantial evidence is relevant.   For example, plaintiffs may argue that the jury should be entitled to infer actual knowledge based upon the nature of the checks and the circumstances under which defendants took them.   However, if the defendants are able to demonstrate they did not actually inspect the checks and did not breach a standard of care because they used automatic processing, then the nature of the checks, and the circumstances under which they were taken, would be irrelevant.   Third, while there is a certain logic to exposing a bank that has actually aided and abetted fraud to the same period of limitations as the perpetrator (assuming it is longer), initially a claim is nothing more than an allegation and not all plaintiffs who claim that a bank had actual knowledge will be successful in actually proving that to be the case.   And here, given what Articles 3 and 4 generally attempt to accomplish, the interests of providing greater certainty and finality for those who take and otherwise deal with negotiable

instruments in good faith may trump. Or, to put another way, the negotiable instrument plays a more central role in the claims against defendants than it would against Harstad. Cf. DLK Co. of Ohio v. Meece, No. CA2012-07-060, 2013 WL 940148, at *3 (Ohio Ct. App. Mar. 11, 2013) (concluding that the four-year statute of limitations applying to claims for common law conversion applied and not the three-year limitations period under Article 3 to a claim by an employer against the employee committing the defalcations in part because the use of the negotiable instruments was simply the means of the committing the conversion and not central to the claim). Finally, while based upon reasons somewhat different, the Seventh Circuit concluded in Travelers Cas. & Sur. Co. of America, Inc. v. Northwestern Mut. Life Ins. Co., 480 F.3d 499, 505 (7th Cir. 2007) that the claim for fraud in that case was subject to UCC's three-year period of limitations.

### 4. This action is untimely based upon the three-year statute of limitations

It is clear from the face of the complaint that the checks alleged to have been part of the fraudulent scheme were issued and cashed prior to plaintiff becoming aware of the fraud. It is also clear from plaintiff's allegations that more than three years elapsed from when plaintiff acknowledges it became aware that Harstad was paying off her credit card debts by writing checks on plaintiff's account to the date of the filing of this action. That being the case, it makes no difference here whether the cause of action accrued when the acts giving rise to the potential claims were committed or later when plaintiff discovered Harstad's defalcations. Plaintiff's claims are clearly time-barred given the court's conclusion that the three-year limitations period applies to all of plaintiff's claims.

### B. Defendant's other arguments

The court has rejected defendant's argument that 1990 revisions to Articles 3 and 4 have displaced all liability arising out of the application of common law principles in supplementation

of Article 3's provisions. That, however, does not dispose of defendant's arguments that one or more of the specific claims in this case have been displaced by the UCC. The court will address these arguments briefly in the event it is concluding upon appeal that the court erroneously concluded that the three-year limitations period applies to all claims in which a negotiable instrument plays a central part.

### 1.    Plaintiff's claim for negligence

Defendants argue that plaintiff has no claim at common law for negligence based on the fact that plaintiff had no banking relationship with the defendants. There are a number of cases from other jurisdictions in which courts have agreed that to be the case. See, e.g., Eisenberg v. Wachovia Bank, N.A., 301 F.2d 220, 224–25 (4th Cir. 2002) ("Courts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship."); Abbasid, Inc. v. First National Bank of Santa Fe, Nos. CV-09-00347 & CV-09-00354, 2010 WL 11509104, at *5 (D.N.M. Feb. 10, 2010) (concluding that, even if plaintiff could maintain a common law claim for negligence, it would fail because the defendant bank owed no duty to plaintiff, a noncustomer); Travelers Casualty and Surety Co. of America v. Bancorp Bank, 691 F. Supp. 2d 531, 536–37 (D. Del. 2009) (concluding that a depository bank owes no common law duty to a drawer because of the lack of any banking relationship even when the check is made payable to the depository bank and the drawer owes it no debt).

As noted earlier, this same no duty argument was made by Western State Bank in Alerus. And, while the North Dakota Supreme Court did not specifically state it agreed, the court looked to § 41-03-33 (3-307) to define Alerus's duty and concluded there were material issues of disputed fact with respect to whether that duty was breached given the existence of circumstances that may have put Alerus on notice of the breach of fiduciary duty.

24

Also, in addition to § 41-03-33 (3-307), there are other provisions of Article 3 that may bear upon plaintiff's claim for negligence. In particular, there is the definition of "ordinary care" under § 41-03-03(g) (3-103), which reads:

> g. "Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards prevailing in the area in which that person is located with respect to the business in which that person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this chapter or chapter 41-04.

Plaintiff contends in its complaint that defendants should have known of the fraudulent scheme based upon the nature of the checks and the circumstances under which they were presented (*i.e.*, drawn on plaintiff's bank account but for satisfaction Harstad's personal credit card debts). However, there are a number of cases where credit card companies have been able to defend against claims for negligence based on arguments that (1) they lacked actual awareness of any issues detectable by examination of the individual checks because they relied upon automated processing, and (2) there was no duty on their part to examine the individual checks given the lack of relationship to the drawer of the check or, alternatively, the non-inspection of the individual checks comported with reasonable commercial standards and general banking practice. See, e.g., DBI Architects, P.C. v. American Express Travel-Related Svcs. Co., Inc., 388 F.3d 886, 895–96 (D.C. Cir. 2006); In re Pratt, No. 1:13-cv-1083, 2017 WL 4516822 at **9–12 (W.D. Mich. July 6, 2017); Travelers Casualty & Surety Co. v. Citibank (South Dakota), N.A., No. 03-2548, 2007 WL 2875460, at **2–5 (M.D. Fla. Sept. 28, 2007); Grand Rapids Auto Sales v. MBNA Am. Bank, 227 F. Supp. 2d 721, 724–29 (W.D. Mich. 2002).

Because Article 3 defines the duty of defendants and likely also the standard of care, the

North Dakota Supreme Court would conclude not only that plaintiff's negligence claim arises out of Article 3 but also that it foreclose any argument for a freestanding common law claim for negligence in this particular instance.  See, e.g., Travelers Cas. & Sur. Co. of America, Inc. v. Northwestern Mut. Life Ins. Co. Travelers Cas., 480 F.2d at 504–05 ("Travelers also tries to get out from under the statute of limitations in section 3–118(g) by recharacterizing its claim against Merrill Lynch as something other than a claim under section 3–307, such as a common law fraud claim. Since section 3–307 fits the facts of the case to a T, no room is left for recharacterizations intended to circumvent the statute of limitations applicable to such claims. It is one thing to fill gaps in the Uniform Commercial Code and another to contradict it by calling a UCC claim something else."); Shelby Resources, LLC v. Wells Fargo Bank, 160 P.3d 387, 391 (Colo. Ct. App. 2007) ("By its own language, the UCC does not purport to displace the entire body of common law. Section 4–1–103(a). Accordingly, when the UCC prescribes particular standards of care or limitations on liability, the common law is annulled to the extent it modifies these standards or changes these limitations.") (internal quotations and citing authority omitted);  Bradley v. First Nat. Bank of Walker, N.A., 711 N.W.2d at 127 ("The statute itself demonstrates that the legislature intended for it to be a comprehensive liability scheme. 'Section 3–307 is intended to clarify the law by stating rules that comprehensively cover the issue of when the taker of an instrument has notice of breach of a fiduciary duty and thus notice of a claim to the instrument or its proceeds.' UCC § 3–307, cmt. 1.").[4]

---

[4] While Article 3's provisions foreclose any argument for broader liability through application of common law negligence principles, the North Dakota Supreme Court might look to common law principles to supplement the provisions of the UCC with respect to a defense of comparative fault.  If it turned out that the one or both of the defendants actually inspected the checks in question (possibly due to internal fraud protocols being triggered) and if it was determined there was negligence in failing to take action, the North Dakota Supreme Court might conclude it would be appropriate to apply comparative negligence principles comparable to those set forth in §§ 41-03-42 (3-405) and 41-03-43 (3-406), which, by their terms, are confined to negligence in cases involving a forged signature or alteration of an instrument and not an unauthorized signature.  See White, Summers, & Hillman § 19.25.

Consequently, even if the court has erred in concluding that all claims for negligence in cases where a negotiable instrument plays a central part are subject to the three-year limitations period, plaintiff's negligence claim in this case clearly arises out of Article 3 and is subject to Article 3's three-year limitations period. Cf. Magnum LTL, Inc. v. Wells Fargo Bank, National Association, Case No. 3:14-cv-117, Docket No. 80 (D.N.D. Feb. 13, 2017) (concluding that plaintiff's claim for negligence against the defendant bank in that instance arose out of Article 3 and, for that reason, the more specific three-year limitations period in § 41-03-18(7) (3-118) applied and not the six-year limitation period that applies to claims for negligence when there is not a more specific statute).

### 2. Plaintiff's claim for conversion

Defendants contend not only that plaintiff does not have a common law claim for conversion but also that it has no claim for conversion whatsoever. In support, defendants points to § 41-03-57 (3-420), which reads:

> § 41-03-57. (3-420) Conversion of instrument
>
> 1. The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is purchased from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. *An action for conversion of an instrument may not be brought by the issuer or acceptor of the instrument or by a payee or endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a copayee*.
>
> 2. In an action under subsection 1, the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument.
>
> 3. A representative, other than a depositary bank, that has in good faith dealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.

(italics added).

Defendants argue that the intent of § 41-03-57 (3-420), which is part of the 1990 revisions

to Article 3 enacted in North Dakota in 1991, was to occupy the field such that any liability for conversion for a claim involving a negotiable instrument would only be as provided for under this section. And, that being the case according to defendants, this forecloses any argument for a claim for conversion based solely upon common law principles and for which a longer statute of limitations would apply. The other consequence of the enactment of § 41-03-57 (3-420) according to the defendants is that the language set forth above in italics forecloses any claim for conversion—even one arising under Article 3. This is because plaintiff is an "issuer." See N.D.C.C. §§ 41-03-03(1)(c) (3-103) & 41-03-05(3) (§ 3-105).

Plaintiff disagrees with these arguments. Plaintiff contends that § 41-03-57 (3-420) applies by its terms only to conversion of instruments and not conversion of proceeds from instruments, which plaintiff contends is its claim here and one arising under common law.

In other jurisdictions, some courts have agreed that § 41-03-57 (3-420) governs all claims for conversion. See, e.g., Grand Rapids Auto Sales, Inc. v. MBNA America Bank, 227 F. Supp. 2d at 730 ("GRAS, as the drawer of the checks, is precluded from maintaining a conversion claim. GRAS attempts to avoid this rule by arguing that its claim is for conversion of the proceeds of the checks rather than checks themselves. This argument must be rejected because the UCC does not draw a distinction between the checks and the proceeds received from the checks."). Other courts, however, have agreed with plaintiff that § 41-03-57 (3-420) only applies to claims for conversion of instruments and not other claims for conversion. Southland Health Services, Inc. v. Bank of Vernon, 887 F. Supp. 2d 1158, 1175 (N.D. Ala. 2012) ("By its terms, § 7-3-420 applies only to instruments . . . .") (italics in original); DLK Co. of Ohio v. Meece, 2013 WL 940148, at *3 ("The UCC contemplates only conversion of 'instruments'").

In Alerus, the North Dakota Supreme Court preliminarily allowed a claim for conversion to

proceed against the drawer in that case concluding only that the reason articulated by the trial court for dismissal of the claim was legally wrong.  As noted earlier, the court left it up to the trial court to sort out which of the claims the plaintiff in that case might have along with any applicable defenses.

The undersigned suspects that the North Dakota Supreme Court would conclude that plaintiff's other claims (particularly negligence or aiding and abetting fraud if the requisite intent can be shown) are more consistent with provisions of the UCC  that the court would also conclude apply to any such claims against defendants.  These include § 41-03-03(g) (3-103) (defining what constitutes ordinary care), § 41-03-28 (3-302) (holder in due course), and §  41-03-33 (3-307) (defining scope of responsibility with respect to unauthorized signatures).[5]  But, even if that is not the case, the North Dakota Supreme Court would conclude that any claim for conversion in this instance arises out of Article 3 because of the applicability of the foregoing provisions and would be time-barred for this reason.[6]

_____

[5]  In North Dakota, it may not make a significant difference whether the claim is one for conversion as opposed to negligence so long as the foregoing provisions of the UCC would apply and defendants' receipt of the payments is not  "wrongful" if done without the appropriate knowledge the signatures were unauthorized.  This is because, if law outside of the UCC is looked to supplement its provisions, North Dakota's comparative fault law provides for comparing of fault for all acts or omissions (both intentional or simply negligent) that give rise to tort liability.  N.D.C.C. §§ 32-03.2-01 (defining "fault") & 32-03.2-02 (comparing fault). This includes acts of fraud and conversion, since both are torts.  See WFND, LLC v. Fargo Marc, LLC, 2007 ND 67, 730 N.W.2d 841 ("For purposes of applying comparative fault statutes, fault is defined in N.D.C.C. § 32-03.2-01 as including 'acts or omissions . . . that subject a person to tort liability.'  Fraud is a tort action.") Case Credit Corp. v. Oppegard's Inc., 2005 ND 141, ¶¶ 8–10, 701 N.W.2d 891 (affirming trial courts instructions on comparative fault with respect to a claim of aiding a conversion).

[6]  There may be another reason why plaintiff would have no freestanding claim for common law conversion and, hence, no argument for a longer statute of limitations with respect to any such claim.  In many jurisdictions (and probably the prevailing rule) is that money proceeds are not subject to a claim for conversion, except, perhaps, when the proceeds are still existing and in a specific account.  See, e.g., Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1163–64 (Ala. 2003) (noting the common law rule but concluding in that case that the funds were sufficiently segregated and identifiable such that jury could have concluded the funds were converted); Allied Investment Corp. v. Jasen, 731 A.2d 957, 963–67 (Md. Ct. App. 1999) (extensively discussing the common law rule, treatise authority, and citing cases from other jurisdictions); see generally 18 Am. Jur. 2d Conversion § 7.  It does not appear this was argued in Alerus.

### 3.    Plaintiff's claim for "money had and received"

Defendants argue that plaintiff's claim for money had and received is no different than the claim for conversion.  In support, defendants cite only to <u>Hartford v. First Union National Bank</u>, No. 161145, 1998 WL 972158 (Vir. Cir. Ct. April 1, 1998) where the court  stated that, for purposes of that case, it would treat the claim for money had and received and conversion as being the same based upon a prior Virginia case stating that the two claims are very similar.  <u>Hartford v. First Union National Bank</u>, No. 161145, 1998 WL 972158 (Vir. Cir. Ct. April 1, 1998).  Hence, according to defendants, it too should be dismissed based upon the provision in § 41-03-57(1) (3-420) that an issuer does not have a claim for conversion of an instrument.

 At least under North Dakota law,  the claim for money had and received appears to be more quasi-contractual in nature (as opposed to one arising in tort like conversion) and similar, if not the same, as a claim for unjust enrichment. <u>See</u>, <u>e.g.</u>, <u>Richland County v. State</u>, 180 N.W.2d 649, 655 (N.D. 1970)  ("An action for money had and received will lie whenever one party has in his possession money which in equity belongs to another and ought to be delivered to such party. An action for money had and received is in the nature of an equitable remedy to compel a party unjustly enriched at the expense of another to disgorge that which it thus has received and to deliver it to the one entitled."); <u>see generally</u>  66 Am. Jur. 2d <u>Restitution and Implied Contracts</u> § 156 (last updated Feb. 2019) ("An action for 'money had and received,'or the more modern action for 'unjust enrichment,' is said to be a remedy equitable in nature, requiring proof that the money has been paid due to fraud, misrepresentation, imposition, duress, undue influence, mistake, or as the result of some other grounds appropriate for intervention by a court of equity.").   Further, contrary to the conclusion reached in the case cited by defendants, the court in <u>Southland Health Services, Inc. v. Bank of Vernon</u>, <u>supra</u>, treated the claim for money had and received as being most similar to a

claim for unjust enrichment under Alabama law and dismissed the claims for conversion in that case but not the claim for money had and received. 887 F. Supp. 2d at 1174–75, 1185–89 (N.D. Ala. 2012).

Nevertheless, for reasons expressed above with respect to the claim for conversion, it is doubtful that the North Dakota Supreme Court would apply the common law of money had and received given the provisions of Article 3 set forth earlier that the court would likely conclude apply to any claim against the defendants. Further, so long as plaintiff would have adequate tort remedies if the conditions for obtaining that relief can be satisfied, that might foreclose the equitable remedy of restitution. Cf, e.g., Raaum Estates by and though Raaum v. Murex Petroleum Corporation, 2017 WL 2870070, at **19–20 (D.N.D. July 5, 2017) (discussing whether there can be recovery for unjust enrichment under North Dakota law when there are other adequate tort remedies).

In any event, the court agrees that the North Dakota Supreme Court would conclude that any claim for money had and received in this instance would arise out of Article 3 for the same reasons expressed for the claims of negligence and conversion. Hence, the claim is time-barred for this reason even if the court is incorrect in its more general conclusion that Article 3's three-year limitations period applies to all claims in which a negotiable instrument plays a central role even if the liability is created by the supplementation of common law principles.

## III.    CONCLUSIONS AND ORDER

For the reasons articulated above, the court concludes that plaintiff's claims are barred by the three-year statute of limitations set forth in § 41-03-18(7) (3-118). For this reason, defendants' motions to dismiss (Doc Nos. 7 & 14) are **GRANTED** and plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

.     Dated this 3rd day of June, 2019.

/s/  Charles S.  Miller, Jr.
Charles S.  Miller, Jr.
United States Magistrate Judge